**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LORI MARINO
4100 Kanab Canyon Rd.
Kanab, UT 84741

HEATHER RALLY
501 Front St.
Norfolk, VA 23510

LESLIE CORNICK
3203 E. Congress Ave.
Spokane, WA 99223

NAOMI ROSE
900 Pennsylvania Ave, SE
Washington, DC 20003

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC
501 Front St.
Norfolk, VA 23510

ANIMAL WELFARE INSTITUTE
900 Pennsylvania Ave, SE
Washington, DC 20003

EARTH ISLAND INSTITUTE
2150 Allston Way, Suite 460
Berkeley, CA 94704

WHALE AND DOLPHIN CONSERVATION
7 Nelson St.
Plymouth, MA 02360

and

CETACEAN SOCIETY INTERNATIONAL
162 Selden Hill Dr.
West Hartford, CT 06107

Plaintiffs,

v.

Civ. No.

NATIONAL OCEANIC and ATMOSPHERIC ADMINISTRATION
1401 Constitution Ave NW, Rm. 5128
Washington, DC 20230,

NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway, 14th Floor
Silver Spring, MD 20910,

RDML TIM GALLUDET, Assistant Secretary of Commerce for Oceans and Atmosphere and Acting Under Secretary of Commerce for Oceans and Atmosphere
National Oceanic & Atmospheric Administration
1401 Constitution Ave. NW, Room 5128
Washington, DC 20230,

CHRIS OLIVER, Assistant Administrator for Fisheries
National Marine Fisheries Service
National Oceanic & Atmospheric Administration
1315 East-West Highway, 14th Floor
Silver Spring, MD 20910,

and

DONNA WIETING, Director
Office of Protected Resources
National Marine Fisheries Service
National Oceanic & Atmospheric Administration
1315 East-West Highway, 13th Floor
Silver Spring, MD 20910

Defendants.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1. This case challenges the final decision by the National Marine Fisheries Service ("NMFS") that it lacks any legal authority under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361-1423h, to enforce MMPA permit conditions requiring marine parks and zoos to provide routinely compiled medical and scientific information when a

cetacean—i.e., a whale, dolphin, or porpoise—that has been held in captivity pursuant to that permit dies. Plaintiffs are leading marine mammal scientists and professionals who rely on the availability of information regarding cetacean health for their livelihoods and non-profit organizations that likewise depend on such information to carry out their missions. NMFS takes the position that the legal validity of the permit conditions at issue was extinguished by 1994 amendments to the MMPA, a position that is at odds with the language of the MMPA, the legislative history underlying the 1994 amendments, and the overriding purpose of the statute to protect marine mammals. As a result of NMFS's erroneous (and unexplained) interpretation of the law, plaintiffs are unable to obtain the medical and scientific information vital to their professional and organizational pursuits, information that would otherwise be routinely available to them through, e.g., the Freedom of Information Act ("FOIA"). NMFS has never provided any legal explanation for that position—including in response to a FOIA request that is at issue in a related case pending in this Court, *see* Civ. No. 18-cv-00047-CKK. Consequently, the agency decision at issue is arbitrary, capricious, an abuse of discretion and not otherwise in accordance with law in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), and must be set aside and remanded for further consideration.

**JURISDICTION AND VENUE**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e).

## PARTIES

### Plaintiff Lori Marino

4. Plaintiff Dr. Lori Marino is the Founder and Executive Director of The Kimmela Center for Animal Advocacy. She has served as the Executive Director of The Kimmela Center since 2011. She held academic positions on animal welfare and cetacean cognition-related subjects at Emory University between 1997 and 2014. She currently lives in Kanab, Utah. Dr. Marino is a neuroscientist, and holds a Ph.D. in Biopsychology from the State University of New York at Albany. Dr. Marino is a world-renowned expert in animal behavior and intelligence. Her specific interests are in brain-behavior relationships, the evolution of intelligence, self-awareness in nonhuman species, and, more recently, human-nonhuman relationships. She has lectured widely and published more than 100 peer-reviewed scientific papers on these topics.

5. Dr. Marino has extensive experience studying cetaceans both in the wild and in captivity. She co-authored the first study showing mirror self-recognition in bottlenose dolphins in 2001, demonstrating that bottlenose dolphins possess the ability of visual self-recognition, a sign of self-awareness and intelligence. Over half of her published papers and lectures address issues of cetacean neuroanatomy, biology, intelligence, and cognition. She has also conducted extensive research and published multiple peer-reviewed papers on human-cetacean relationships, and the impacts of captivity on cetacean biology and behavior. Given her experience and body of work, Dr. Marino is widely considered one of the foremost experts on cetacean brain function and behavior. Her expertise in cetacean behavior and neuroscience, and cetaceans’ relationships and interactions with humans, has been recognized by the United States Congress. In 2010, she gave oral and written testimony to the House Committee on Natural

Resources, Subcommittee on Insular Affairs, Oceans and Wildlife regarding the educational aspects of public display of marine mammals.

6.      Because deceased wild specimens are rarely found in a suitable condition to be meaningfully studied—if the bodies are found at all—the necropsy and medical records of captive cetaceans present the best opportunity to develop a more complete picture of cetacean neurobiology and health, and as such, are essential to Dr. Marino's work. Indeed, Dr. Marino has relied on data obtained from the few cetacean necropsy and clinical history reports that are available when conducting her research on such topics as the impacts of chronic stress, brain-behavior relationships, and neuroanatomical abnormalities and pathologies (e.g., cancerous tumors and other diseases). Along with other experts in the field, Dr. Marino is writing a scientific article entitled *The Effects of Chronic Stress on Captive Orca (*Orcinus Orca*) Well-being*, and her preparation of this article has been hindered by the lack of necropsy and clinical history reports available from sources other than the public display industry. Moreover, very few public display facilities make such reports available on a voluntary basis. NMFS's decision that it is legally precluded from requesting the records prevents Dr. Marino from obtaining those data and as such, harms Dr. Marino's ability to prepare the article on the effects of chronic stress on captive orcas, and inhibits her ability to draw accurate conclusions from the incomplete data. As a result, the quality of her science is negatively impacted, as is her ability to publish her work, and advance her professional career.

7.      As a neurobiologist and behaviorist, Dr. Marino has a particular professional and personal interest in studying the brains of individual animals and understanding the links between neuroanatomy, biology, and behavior. NMFS's unexplained and erroneous decision that it has no legal authority to enforce the permit conditions at issue harms Dr. Marino's professional

interests and pursuits in a number of ways. This decision deprives Dr. Marino of necropsy and clinical history information concerning captive cetaceans, impairs Dr. Marino's ability to obtain medical data that are vital to her research, inhibits her ability to address important research questions, places her at a disadvantage in her professional pursuits as compared to scientists who work for zoos and marine parks and who therefore have access to the information, and precludes her from fully participating in the scientific community, thus significantly impeding her professional endeavors. Thus, NMFS's decision has the added effect of putting Dr. Marino at a competitive disadvantage as compared to scientists and veterinarians who work for marine parks and zoos (such as those at SeaWorld). These individuals have access to data held at their facilities, which should be legally available to NMFS, yet rarely publish in peer-reviewed scientific journals. As a result, much of the information regarding the impacts of captivity on cetaceans comes from articles published by facilities with a vested interest in continuing the practice. Without access to the same data, Dr. Marino is unable to evaluate the validity of all of the facilities' claims or conduct research and publish articles regarding the impacts of captivity on cetaceans, thus impeding her work as a scientist.

8.     The concrete injuries to Dr. Marino's personal and professional interests described above are ongoing, and are directly traceable to NMFS's decision that it lacks jurisdiction to obtain the necropsy and other data regarding captive cetaceans obtained pursuant to permits the agency issued. A court order declaring NMFS's decision to be arbitrary and capricious or otherwise contrary to law, and remanding the issue to the agency, would redress Dr. Marino's injuries.

**Plaintiff Heather Rally**

9.      Plaintiff Dr. Heather Rally, D.V.M., is the Supervising Veterinarian in Captive Animal Law Enforcement for the Foundation to Support Animal Protection, also known as the PETA Foundation. The PETA Foundation is based out of PETA's Los Angeles office. Dr. Rally received her Doctorate of Veterinary Medicine from Western University of Health Sciences in 2014. Upon her graduation, she received the Dean's Award for exemplary service to the University and community at large, leadership, and academic standing.

10.     Dr. Rally has been an active member of the wild animal veterinary community, and has particular experience with marine mammal veterinary and husbandry practices. Over the course of her career, Dr. Rally has interned, externed, and volunteered in a variety of capacities for several marine mammal stranding response, rescue, and rehabilitation clinics along the coast of California, including at the Channel Islands Marine and Wildlife Institute in Goleta, the Fort MacArthur Marine Mammal Care Center in San Pedro, and at The Marine Mammal Center in Marin County. During veterinary school she conducted research into the high rate of juvenile mortality in Southern right whales in Argentina, assisted on several expeditions to assess Atlantic bottlenose dolphin health in the Indian River Lagoon with the Harbor Branch Oceanographic Institute, and coordinated student affairs for MarVet, an introductory course on marine mammal health for veterinary students and veterinarians. During her veterinary career, Dr. Rally has also served as an advisor to several animal welfare groups seeking to establish the world's first seaside sanctuaries for rescued and retired cetaceans, including initiatives in the Caribbean, Italy, and in North America. She has spent hundreds of hours observing captive orcas and other cetaceans in a variety of settings, including all three SeaWorld parks in the United States as well as Loro Parque in Tenerife, Spain.

11. Dr. Rally serves as adjunct faculty in Vermont Law School's summer session, where she teaches Animal Welfare Law, which covers the health and well-being of cetaceans in captivity. She is the lead author of *Looking Behind the Curtain: Achieving Disclosure of Medical and Scientific Information for Cetaceans in Captivity Through Voluntary Compliance and Federal Enforcement*, which was published in November 2018 in the twenty-fourth volume of the *Animal Law Review*. The article concerns the circumstances presented by the case initiated by this complaint. Additionally, along with Dr. Marino, she is preparing the article, *The Effects of Chronic Stress on Captive Orca (*Orcinus orca*) Well-being*. *See* ¶ 6, *supra*. Like Dr. Marino, Dr. Rally has been hindered in the preparation of this article by the lack of publicly available cetacean necropsy reports.

12. As a Supervising Veterinarian at the PETA Foundation, Dr. Rally draws upon her expertise in veterinary medicine and animal behavior to review and advise on specific cases of abuse and neglect involving captive wildlife. In this capacity, she evaluates the physical and behavioral health of individual animals held in subpar captive conditions to help secure improvements in care, enforce applicable laws, and relocate animals to reputable facilities. To do so, she relies heavily upon available behavioral and medical records, as well as necropsy reports where applicable. These records are of immense value to her efforts to safeguard animal health and welfare, as they deepen her understanding of animal health and wellbeing in various captive conditions, and allow her to improve and refine her veterinary practices. To that end, Dr. Rally was heavily involved in early discussions with NMFS and the Marine Mammal Commission ("MMC") regarding issues related to necropsy reports and the effect of the 1994 MMPA amendments on pre-1994 permit provisions requiring permit holders to compile and submit necropsy and clinical history data to NMFS upon the death of the animal. In 2016 and 2017, Dr.

Rally attended meetings with NMFS, the MMC, the U.S. Fish and Wildlife Service ("FWS"),

and the U.S. Department of the Interior ("DOI") Solicitor's Office. During this time, Dr. Rally

also engaged in extensive correspondence with NMFS, in which she described her personal and

professional interest in the necropsy reports—including the importance of necropsy reports to her

professional endeavors. She also participated in a meeting with these agencies and SeaWorld on

May 1, 2017, to discuss the importance of access to medical and scientific information

maintained by SeaWorld on its captive marine mammals, including necropsy reports. Dr. Rally

also co-authored a white paper in support of the continuing applicability of the permit conditions

at issue ("Necropsy Provision Issue Paper"), which she provided to NMFS, the MMC, and FWS.

Dr. Rally, along with other experts, also submitted a request for necropsy reports under Section

402 of the MMPA. Despite repeated overtures to NMFS, the agency ultimately informed Dr.

Rally of its "belief" that the 1994 MMPA amendments "effectively extinguished" the permit

conditions at issue.

13.     NMFS's unexplained and legally unsupported decision deprives the scientific

community of necropsy and clinical history information concerning captive cetaceans held

pursuant to federal permits issued under the MMPA, and thereby harms Dr. Rally's personal and

professional pursuits in a number of ways. NMFS's decision deprives Dr. Rally of crucial

information concerning the health and wellbeing of captive cetaceans, which in turn, frustrates

Dr. Rally's professional efforts to accurately evaluate the condition and wellbeing of captive

cetaceans; improve her understanding of the unique, complex, and largely unknown physical and

behavioral needs of cetaceans; evolve new and improved veterinary and husbandry practices that

better meet those needs; and advise the veterinary, scientific, advocacy, and regulatory

communities on veterinary practices and animal health and wellbeing. Dr. Rally relies on clinical

history and necropsy reports not only to provide insights into an individual animal's death, but to better understand disease processes and how those processes are linked to environmental or husbandry factors, hormonal or behavioral factors, and/or diagnostic or therapeutic failures or shortcomings. NMFS's decision that it lacks the authority to enforce the permit conditions at issue hinders Dr. Rally's ability to obtain information important to her research for her article concerning the effects of chronic stress on orcas in captivity, *see* ¶ 11, *supra*, and will hinder her future work on issues concerning captive cetaceans. Thus, as a consequence of NMFS's decision that it lacks authority to obtain necropsy and other data under the permit conditions at issue, Dr. Rally's personal and professional interests in advancing her veterinary practice—and the practice of the wild animal veterinary community as a whole—are significantly impaired.

14.     Additionally, NMFS's decisions obstruct Dr. Rally's access to vital data required to critically evaluate the unchallenged assertions made by SeaWorld's veterinarians regarding the health, welfare, and care of captive orcas. As a result, Dr. Rally's ability to publish and otherwise engage in academic and professional pursuits to advance her career interests are disadvantaged compared to veterinarians who work for, or are affiliated with, zoos and marine parks (such as those at SeaWorld), and who have access to the information contained in the necropsy and clinical history reports. Accordingly, Dr. Rally's personal and professional interests in assessing the impacts of captivity on cetaceans and advocating for improved zoological husbandry and veterinary practices for the betterment of captive animal wellbeing are significantly impeded.

15.     NMFS's decisions also prevent Dr. Rally from addressing certain research questions that are critical to her work advising animal welfare groups working to improve the standards of care for captive cetaceans. Dr. Rally seeks to base her advice concerning the

medical and welfare needs of captive cetaceans, including the opportunities to establish seaside sanctuaries for whales removed from captivity, on the best available science with regard to biology, behavior, disease, and mortality; however, due to NMFS's decision, most of those data are unavailable, which in turn, frustrates Dr. Rally's personal and professional interests in advancing the care and welfare of captive cetaceans.

16. The concrete injuries to Dr. Rally's personal and professional interests described above are ongoing, and are directly traceable to NMFS's decision that it lacks jurisdiction to obtain the necropsy and other data regarding captive cetaceans. A court order declaring NMFS's decision to be arbitrary and capricious or otherwise contrary to law, and remanding the issue to the agency, would redress Dr. Rally's injuries.

**Plaintiff Leslie Cornick**

17. Plaintiff Dr. Leslie Cornick serves as the Science Officer for the Marine Section of the Society for Conservation Biology, and as the Congress Chair for the 2019 International Congress for Conservation Biology. Dr. Cornick holds a Ph.D. in Wildlife and Fisheries Sciences from Texas A&M University, and resides in Cheney, Washington. Her research primarily focuses on marine mammals, and she has conducted research on both wild and captive cetaceans. Additionally, she has served as an expert witness in lawsuits concerning captive belugas.

18. Dr. Cornick has a personal and professional interest in obtaining the data contained in the necropsy and clinical history reports of captive cetaceans, and in particular, orcas. For the past fifteen years, she has studied marine mammals both in the wild and in captivity, and has worked to understand the complexity of cetacean social structures and biological needs. She has witnessed firsthand the abnormal behaviors displayed by captive

cetaceans, and has observed that many cetaceans in captivity have reduced lifespans. These experiences inspired Dr. Cornick to become an advocate for developing a deeper understanding of the implications of captivity on marine mammals to allow regulators, the industry, and the public to make informed decisions about animal welfare.

19.     NMFS's unexplained and legally unsupported decision that has the effect of depriving the scientific community of necropsy and clinical history information concerning captive cetaceans inhibits Dr. Cornick's ability to conduct meaningful scientific research to further her advocacy efforts. Dr. Cornick has sought to participate in the scientific discourse surrounding cetacean captivity issues, yet finds herself impaired in her ability to contribute to the conversation due to her inability to access crucial data. For example, as a member of the Society for Marine Mammalogy, Dr. Cornick was stymied in her ability to respond to a letter published by SeaWorld veterinarians in the Society's journal, the Journal for Marine Mammalogy. The letter critiqued a peer reviewed paper on orca survivorship in captivity. Dr. Cornick hoped to publish a rebuttal paper on the survivorship of captive versus wild orcas; however, due to the lack of available data on the health and welfare of captive orca, Dr. Cornick was precluded from participating in the scientific discourse. Thus, as a consequence of NMFS's decision that it lacks authority to obtain necropsy and other data, Dr. Cornick is at a competitive disadvantage as compared to scientists and veterinarians who work for, or are affiliated with, zoos and marine parks (such as SeaWorld) who have access to the data, and can make assertions regarding the health and welfare of captive orcas that cannot be challenged based on the underlying data. These assertions are often published in sources that are not subject to peer review. As a result, Dr. Cornick's personal and professional interests in assessing the impacts of captivity on cetaceans and advocating for science-based policies are injured.

20. The concrete injuries to Dr. Cornick's personal and professional interests described above are ongoing, and are directly traceable to NMFS's decision that it lacks jurisdiction to obtain the necropsy and other data regarding captive cetaceans. Dr. Cornick's injuries would be remedied by a Court order finding NMFS's decision to be arbitrary and capricious or otherwise contrary to law, and remanding the issue to the agency.

**Plaintiff Naomi Rose**

21. Plaintiff Dr. Naomi Rose is a marine mammal biologist, and is currently serving as the marine mammal scientist at the Animal Welfare Institute ("AWI"), based in Washington, DC. Additionally, she is a member of the International Whaling Commission Scientific Committee's Sub-Committees for Whale Watching and Environmental Concerns, and serves as a consultant to Dolphinaria-Free Europe, a coalition of non-governmental organizations and professionals that works to end the keeping of cetaceans in captivity in Europe and seeks greater protection for captive cetaceans through investigation, advocacy, and education. Dr. Rose received her Ph.D. in biology from the University of California, Santa Cruz in 1992, where she studied the social dynamics of free-ranging orcas. For the past twenty-five years, Dr. Rose has worked for non-profit animal protection organizations, where she has focused on marine mammal protection policy. Dr. Rose is widely regarded as a leading marine mammal scientist, and is particularly recognized for her work on the welfare of captive marine mammals, particularly orcas. She lectures and writes frequently on marine mammal captivity issues, including on the implementation of the MMPA, the regulation of the public display industry, and animal welfare and conservation issues related to captive cetaceans. She has testified on various issues concerning the public display of cetaceans before the Canadian Parliament, Senate Committee on Fisheries; the United States House Committee on Natural Resources,

Subcommittee on Insular Affairs, Oceans and Wildlife; NMFS; and various state legislatures and commissions. Dr. Rose has also published widely on the nexus between marine mammal science and policy, and in particular, on incorporating science into the regulation of the public display industry.

22.     In her role as a member of the marine mammal science community, Dr. Rose advocates for the use of science-based information to improve the welfare of captive marine mammals, inform the development of standards for marine mammal captivity that accurately reflect the needs of individual species, and determine whether and which particular species are ill-suited for public display. Accordingly, the content of necropsy reports and clinical histories is of vital importance to Dr. Rose's personal and professional interests in addressing and advocating for the health and welfare of captive marine mammals.

23.     Additionally, the necropsy and clinical history reports of captive animals contain information regarding illnesses and the success of various treatments, many of which also affect wild cetaceans (e.g., pneumonia). Captive cetaceans are sometimes treated for conditions and diseases with sufficient efficacy that the animal survives for some time after diagnosis. Such treatment information, available in clinical histories and necropsy reports, would greatly benefit stranding networks that rescue cetaceans and attempt to treat and rehabilitate them for a return to the wild. Accordingly, access to the medical data contained in necropsy and clinical history reports of captive cetaceans is critical to Dr. Rose's work addressing the rescue, treatment, and release of sick or injured stranded cetaceans.

24.     To that end, Dr. Rose was heavily involved in discussions with NMFS, the MMC, and the DOI Solicitor's Office regarding issues related to necropsy reports and the effect of the 1994 MMPA amendments on the permit conditions at issue. Dr. Rose participated in the meeting

with SeaWorld and federal agencies on May 1, 2017 regarding access to medical and health information about marine mammals in captivity. Additionally, Dr. Rose engaged in extensive correspondence with NMFS, in which she described her personal and professional interest in the necropsy reports—including the importance of necropsy reports to her professional endeavors—and requested a meeting to discuss the enforcement of the permit conditions at issue. Despite repeated overtures to NMFS, the agency ultimately informed Dr. Rose of its "belief" that the 1994 MMPA amendments "effectively extinguished" the permit conditions at issue.

25.     NMFS's unexplained and legally erroneous decision that the 1994 MMPA amendments extinguished the permit conditions at issue has the effect of depriving the scientific community of necropsy and clinical history information concerning captive cetaceans and frustrates and impairs Dr. Rose's advocacy, and her research in service of that advocacy on behalf of cetaceans. There is little information on the health and welfare of captive cetaceans—and in particular, captive orcas—available in the published, peer-reviewed literature. As a scientist and an advocate, Dr. Rose works to obtain, organize, and disseminate information regarding the impacts of captivity on marine mammals—including orcas—to regulators, the scientific community, and the public. Because her advocacy is science-based, Dr. Rose has previously used what little information regarding the clinical histories of captive cetaceans there is available in her research and advocacy, and considers greater access to necropsy and clinical history reports crucial to her professional endeavors. NMFS's legally unsupported and erroneous decisions regarding its ability to collect such information pursuant to the permits it issued deprives Dr. Rose of access to those data. Accordingly, Dr. Rose's ability to research and evaluate how various factors related to captivity affect cetacean health and welfare is significantly impeded. This, in turn, negatively affects her ability to participate in the scientific

discourse regarding the impacts of captivity on individual marine mammals, and prevents her from effectively advocating for the improved welfare of captive cetaceans using science-based information.

26. NMFS's decision has the added effect of putting Dr. Rose at a disadvantage as compared to scientists and veterinarians who work at SeaWorld and other marine parks and zoos, who have access to data in the possession of their facilities yet rarely publish in peer-reviewed scientific journals. As a result, much of the information regarding the impacts about such data of captivity on cetaceans comes from non-peer-reviewed articles published by individuals affiliated with institutions with a vested interest in continuing the practices of concern to Dr. Rose and on which she has expertise. Without access to the same data, Dr. Rose is unable to fully evaluate the validity of all of the public display industry's claims regarding the impacts of captivity on cetaceans, thus impeding her work as both a scientist and an advocate at AWI.

27. The concrete injuries to Dr. Rose's personal and professional interests described above are ongoing, and are directly traceable to NMFS's decision that it lacks jurisdiction to obtain the necropsy and other data regarding captive cetaceans. A court order declaring NMFS's decision to be arbitrary and capricious or otherwise contrary to law, and remanding the issue to the agency, would redress Dr. Rose's injuries.

**Plaintiff People for the Ethical Treatment of Animals**

28. Plaintiff People for the Ethical Treatment of Animals, Inc. ("PETA") is a non-profit organization pursuant to section 501(c)(3) of the Internal Revenue Code. Founded in 1980, PETA is dedicated to protecting animals from abuse, neglect, and cruelty, and works to achieve its mission by, among other avenues, conducting research, organizing protest campaigns, conducting corporate outreach, and educating policymakers and the public about animal abuse

and promoting the kind treatment of animals. As one of its four main focus areas, PETA

advocates against the use of animals for entertainment, including the use of cetaceans in the

public display industry.

29.     Many of PETA's members and supporters are specifically interested in the health

and welfare of captive cetaceans. PETA has mounted several successful campaigns to educate

and inspire companies to end promotional partnerships with captive marine mammal programs.

PETA works to educate the public about the serious animal welfare concerns associated with the

public display of captive cetaceans through press releases, media interviews, speaking events,

and publishing to its websites blogs and features on these issues, fact sheets, and alerts to

facilitate members and supporters contacting aquaria and marine parks, supporting legislation

that prohibits the capture of marine mammals or restricts their display, and writing letters to

policymakers asking that they avoid subsidizing public display facilities with taxpayer money.

PETA also disseminates a "Debate Kit" for use by students in classroom settings to support the

argument that marine mammals should not be held in captivity.

30.     PETA regularly engages its members and supporters on the topic of ending the

use of marine mammals for entertainment purposes. PETA has long understood the fundamental

importance of the data contained in the necropsy and clinical history reports of captive cetaceans

to its educational and advocacy efforts. To that end, together with AWI, the Earth Island Institute

("EII"), Whale and Dolphin Conservation ("WDC"), and Cetacean Society International ("CSI"),

(collectively, "Plaintiff Organizations"), PETA engaged in extensive outreach with NMFS

regarding access to records pursuant to the permit conditions at issue.

31.     NMFS's unexplained and legally unsupported decision has the effect of depriving

the scientific community of necropsy and clinical history information concerning captive

cetaceans, and thereby impairs PETA's ability to obtain and analyze information vital to understanding the health and welfare of cetaceans in captivity, effectively impeding PETA's ability to perform its important research, advocacy, and information dissemination functions. PETA has already spent significant time, financial, and staffing resources on communicating with the agency in an attempt to learn about and impact NMFS's position regarding the impacts of the 1994 MMPA amendments on the permit conditions at issue. Additionally, NMFS's position has forced PETA to expend time and resources investigating the condition and welfare of captive cetaceans by alternative means, including by spending hours observing captive cetaceans held in various facilities. However, the observation data PETA gathers cannot possibly fully substitute for concrete scientific and medical data contained in the necropsy and clinical history reports that NMFS insists it lacks the authority to obtain. PETA is also forced to expend time and resources preparing and submitting public records requests to other regulatory bodies and state entities in an attempt to obtain information regarding cetaceans who have died at those captive facilities. Moreover, NMFS's legally flawed interpretation impairs PETA's ability to educate the public and policymakers regarding the conditions endured by cetaceans in captivity and to advocate against the expansion of the public display industry using science-based information, and to educate the public on the dire consequences of captivity on individual marine mammals.

32.     The concrete injuries to PETA's interests are ongoing, and are directly traceable to NMFS's decision that it lacks jurisdiction to request and obtain the necropsy and other data regarding captive cetaceans held captive pursuant to NMFS permits. A court order declaring NMFS's decision to be arbitrary and capricious or otherwise contrary to law, and remanding the issue to the agency, would redress PETA's injuries.

**Plaintiff Animal Welfare Institute**

33. Plaintiff AWI is an organization devoted to the protection of animals and is a non-profit organization pursuant to section 501(c)(3) of the Internal Revenue Code. Founded in 1951, AWI's mission is to alleviate the suffering inflicted on animals by humans. AWI engages policymakers, scientists, industry professionals, non-governmental organizations, farmers, veterinarians, teachers, and the public in its animal protection mission. AWI works to safeguard marine species and their habitats. Its efforts focus on curbing humankind's harmful impacts by urging governments and other decision-makers to halt or prevent damaging actions, including the capture, trade, and confinement of marine mammals for use in the public display industry.

34. AWI has more than 120,000 members and constituents, many of whom are specifically interested in the health and welfare of cetaceans. AWI has long been involved with issues concerning marine mammal captivity—having hired Dr. Rose as the organization's marine mammal scientist in 2013—and has worked with other Plaintiffs to obtain NMFS's position on whether the permit conditions at issue survived the 1994 MMPA amendments since the genesis of the effort, and to persuade NMFS that the permit conditions did survive the amendments. AWI has published multiple reports concerning cetacean captivity—including the comprehensive 2014 report by Dr. Rose entitled *Killer Controversy: Why Orcas Should No Longer Be Kept in Captivity*, and the 2017 report *Improving Captive Marine Mammal Welfare in the United States: Science-based Recommendations for Improved Regulatory Requirements for Captive Marine Mammal Care*—as well as several fact sheets on various aspects of the issue. Moreover, AWI has partnered with international animal protection organizations, including the Hong Kong Dolphin Conservation Society, Marine Connection, WDC, and organizations in mainland China and Taiwan, to raise awareness of the negative welfare impacts associated with

the wild capture of cetaceans and their subsequent public display in marine parks in mainland

China. The alliance, called the China Cetacean Alliance, was formed in the face of a rapidly

expanding public display industry in China, and hopes to use data concerning the health and

welfare of captive cetaceans in the United States to support its advocacy efforts. Again, AWI

seeks to use data concerning the health and welfare of captive cetaceans in the United States to

support its advocacy efforts, and to educate its international partners on the impacts of captivity

on individual animals.

35.     AWI regularly engages its members and constituents on the topic of protecting

marine mammals, and on ending the practice of exploiting cetaceans for human entertainment,

and has long understood the fundamental importance of the data contained in the necropsy and

clinical history reports of captive cetaceans to its educational and advocacy efforts. To that end,

together with other Plaintiff Organizations, AWI engaged in extensive outreach with NMFS

regarding the agency's enforcement of the permit conditions at issue. After outreach efforts

failed, AWI filed a FOIA lawsuit seeking NMFS's legal justification for its position that the

permit conditions at issue are no longer in effect due to the 1994 MMPA amendments. To date,

NMFS has refused to provide the legal basis for its decision.

36.     NMFS's unexplained and legally unsupported decision has the effect of depriving

the scientific community of necropsy and clinical history information concerning captive

cetaceans, and therefore impairs AWI's ability to obtain and analyze information vital to

understanding the health and welfare of cetaceans in captivity, effectively impeding AWI's

ability to perform its important research, advocacy, and information dissemination functions.

AWI has already spent significant resources on negotiating with the agency in an attempt to

establish NMFS's position regarding the impacts of the 1994 MMPA amendments on the permit

conditions at issue. Moreover, NMFS's legally flawed interpretation impairs AWI's ability to carry out its core mission to educate the public regarding the treatment and conditions of cetaceans in captivity and to advocate against the expansion of the public display industry using science-based information, educate the public on the impacts of captivity on marine mammals, and work to improve the health and welfare of cetaceans both in captivity and in the wild.

37.     The concrete injuries to AWI's interests described above are ongoing, and are directly traceable to NMFS's decision that it lacks jurisdiction to obtain the necropsy and other data regarding captive cetaceans. A court order declaring NMFS's decision to be arbitrary and capricious or otherwise contrary to law, and remanding the issue to the agency would redress AWI's injuries.

**Plaintiff Earth Island Institute**

38.     The Earth Island Institute ("EII") is a non-profit organization established pursuant to section 501(c)(3) of the Internal Revenue Code, and acts as a fiscal sponsor to approximately 80 grassroots environmental projects. The International Marine Mammal Project ("IMMP") is a fiscally-sponsored project of EII and is one of the leading groups fighting to protect dolphins, whales, and the ocean environment. IMMP has worked for more than thirty years in opposition to captive cetacean facilities. IMMP is credited with helping to close or prevent the construction of dozens of dolphinariums around the world, and works to continue the fight against existing dolphinariums and new proposals, seek legislation and government policies to end captivity, and educate the public about the harm to these marine mammal species caused by captivity.

39.     As a longtime advocate against marine mammal captivity, IMMP understands the fundamental importance of the data contained in the necropsy and clinical history reports of captive cetaceans to its educational and advocacy efforts. Additionally, IMMP seeks to apply the

best available science with regard to captive cetacean biology, behavior, and mortality to provide a permanent home for captive cetaceans retired by entertainment facilities or unlikely to survive in the wild that is as close to the natural environment as possible. However, due to the NMFS decision at issue, much of those data are unavailable and IMMP's efforts to contribute to the welfare of captive cetaceans and the conservation of those that are in the wild, yet require human intervention due to disease or injury, are impeded. Together with other Plaintiff Organizations, IMMP corresponded with officials at NMFS regarding the agency's enforcement of the permit conditions at issue.

40.     NMFS's unexplained and legally unsupported decision has the effect of depriving the scientific community of necropsy and clinical history information concerning captive cetaceans and impairs IMMP's ability to obtain and analyze information vital to understanding the health and welfare of cetaceans in captivity, effectively impeding IMMP's ability to perform its important research, advocacy, and information dissemination functions. IMMP has already spent resources on communicating with the agency in an attempt to learn about and impact NMFS's position regarding the impacts of the 1994 MMPA amendments on the permit conditions at issue. Moreover, NMFS's legally flawed interpretation impairs IMMP's ability to advocate against the expansion of the public display industry using science-based information, educate the public on impacts of captivity on individual marine mammals, and develop alternatives to captivity.

41.     The concrete injuries to IMMP's, and thus, to EII's interests described above are ongoing, and are directly traceable to NMFS's decision that it lacks jurisdiction to obtain the necropsy and related data regarding captive cetaceans. A court order declaring NMFS's decision

to be arbitrary and capricious or otherwise contrary to law, and remanding the issue, would redress IMMP's, and thus, EII's injuries.

**Plaintiff Whale and Dolphin Conservation**

42. Whale and Dolphin Conservation ("WDC") is dedicated to the protection of whales and dolphins, and is a non-profit organization established pursuant to section 501(c)(3) of the Internal Revenue Code. For over thirty years, WDC has campaigned to end cetacean captivity, and focuses its work on three key areas to achieve its goal: creating sea sanctuaries where whales and dolphins held in captivity can be relocated to live more natural lives if they cannot be returned to the wild; stopping the supply of whales and dolphins to captive facilities; and ending demand for whale and dolphin shows. Through its education and advocacy campaigns, WDC has successfully helped secure a national ban on keeping whales and dolphins in captivity in India, secured a commitment from Virgin Holidays to require its partners to pledge that they will no longer take whales and dolphins from the ocean, and helped prevent the import of wild-caught beluga whales into the United States.

43. As a longtime advocate against marine mammal captivity, WDC understands the fundamental importance of the data contained in the necropsy and clinical history reports of captive cetaceans to its education and advocacy efforts. To that end, together with other Plaintiff Organizations, WDC corresponded with officials at NMFS regarding the agency's enforcement of the permit conditions at issue.

44. NMFS's unexplained and legally unsupported decision that has the effect of depriving the scientific community of necropsy and clinical history information concerning captive cetaceans impairs WDC's ability to obtain and analyze information vital to understanding the health and welfare of cetaceans in captivity, effectively impeding WDC's

ability to perform its important research, advocacy, and information dissemination functions. WDC has already spent resources on communicating with the agency in an attempt to learn about and influence NMFS's position regarding the impacts of the 1994 MMPA amendments on the permit conditions at issue. Moreover, NMFS's legally flawed interpretation impairs WDC's ability to advocate against the expansion of the public display industry using science-based information, work with partners to discourage commercial partnerships with public display facilities, and to educate the public on the negative impacts that captivity has on individual marine mammals.

45. The concrete injuries to WDC's interests described above are ongoing, and are directly traceable to NMFS's decision that it lacks jurisdiction to obtain the necropsy and related data regarding captive cetaceans. A court order declaring NMFS's decision to be arbitrary and capricious or otherwise contrary to law, and remanding the issue, would redress WDC's injuries.

**Plaintiff Cetacean Society International**

46. Cetacean Society International ("CSI") is a conservation, education, and research membership organization working on behalf of cetaceans and their marine environment, and is a non-profit organization established pursuant to section 501(c)(3) of the Internal Revenue Code. Founded in 1974, CSI is as a global leader in cetacean advocacy. One of its main purposes is to oppose cetacean captivity, and advocate for the improvement of the welfare of those that are held in captivity and, wherever possible, their rehabilitation and release.

47. As a conservation, education, and research organization, CSI considers the information held in necropsy and clinical history reports vital to the achievement of its objectives. To that end, together with other Plaintiff Organizations, CSI corresponded with officials at NMFS regarding the agency's enforcement of the permit conditions at issue.

48. NMFS's unexplained and legally unsupported decision that has the effect of depriving the scientific community of necropsy and clinical history information concerning captive cetaceans impairs CSI's ability to obtain and analyze information vital to understanding the health and welfare of cetaceans in captivity, effectively impeding CSI's ability to perform its important research, advocacy, and information dissemination functions. CSI has already spent resources on communicating with the agency in an attempt to learn about and influence NMFS's position regarding the impacts of the 1994 MMPA amendments on the permit conditions at issue. Moreover, NMFS's legally flawed interpretation impairs CSI's ability to advocate against the expansion of the public display industry using science-based information, educate the public on the impacts of captivity on individual marine mammals, and support rescue and rehabilitation efforts for wild cetaceans.

49. The concrete injuries to CSI's interests described above are ongoing, and are directly traceable to NMFS's decision that it lacks jurisdiction to obtain the necropsy and related data regarding captive cetaceans. A court order declaring NMFS's decision to be arbitrary and capricious or otherwise contrary to law, and remanding the issue to the agency would redress CSI's injuries.

**Defendants**

50. Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency within the Department of Commerce and is the parent agency of NMFS. The Secretary of Commerce has delegated responsibility for administering and enforcing the MMPA to NOAA, which in turn, has sub-delegated that responsibility to NMFS.

51.     Defendant NMFS is an agency within NOAA that has been delegated the responsibility to administer and enforce the MMPA, including by issuing permits for the take or import of marine mammals for the purposes of public display.

52.     Defendant Rear Admiral Tim Galludet is the Assistant Secretary of Commerce for Oceans and Atmosphere and Acting Under Secretary of Commerce for Oceans and Atmosphere Administrator of NOAA, the parent agency of NMFS, and, accordingly, is ultimately responsible for the decisions challenged here.

53.     Defendant Chris Oliver is the Assistant Administrator of Fisheries for NMFS, and therefore is also responsible for the decisions at issue.

54.     Defendant Donna Wieting is the Director of the Office of Protected Resources within NMFS—the office responsible for implementing the MMPA—and is also responsible for the decisions at issue.

## FACTS GIVING RISE TO PLAINTIFFS' CLAIMS

## I.      STATUTORY AND REGULATORY FRAMEWORK

### A.      The Marine Mammal Protection Act

55.     In enacting the MMPA, Congress recognized that marine mammals "move in interstate commerce" and that "the protection and conservation of marine mammals and their habitats is therefore necessary to insure the continuing availability of those products which move in interstate commerce." 16 U.S.C. § 1361(5). The MMPA's goal of "protect[ing] and conserv[ing]" marine mammals clearly encompasses captive marine mammals, as these mammals "move in interstate commerce." *Id.* Congress also recognized that "certain species and populations stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities" and "should not be permitted to diminish beyond the point at which

they cease to be a significant functioning element in the ecosystem." *Id.* § 1361(1), (2).

Moreover, Congress conceded that "there is inadequate knowledge of the ecology and population

dynamics of such marine mammals and of the factors which bear upon their ability to reproduce

themselves successfully." *Id.* § 1361(3). Finally, Congress concluded that "marine mammals

have proven themselves to be resources of great international significance, esthetic and

recreational as well as economic," and therefore, marine mammals "should be protected and

encouraged to develop to the greatest extent feasible" with the primary goal being "to maintain

the health and stability of the marine ecosystem." *Id.* § 1361(6).

56.     To accomplish the MMPA's purposes and policies, the law imposed a

"moratorium on the taking and importation of marine mammals and marine mammal products,"

with limited exceptions. *Id.* § 1371(a). The MMPA authorized NOAA to issue permits to take or

import marine mammals pursuant to these excepted activities, provided that the applicant meets

the statutory conditions. *Id.* § 1374. The proposed taking or importation must first be reviewed

by the MMC—an independent agency established by the MMPA and charged with reviewing the

administration of federal activities affecting marine mammals, undertaking scientific reviews and

studies regarding the status of marine mammals, and issuing recommendations to NMFS and

other agencies for the protection and conservation of marine mammals.  *Id.* § 1402.  The MMC

shall recommend such a permit if it is consistent with the purposes and policies of the MMPA.

*Id.* § 1371(a)(1).

57.     Permits to intentionally take or import marine mammals are called "Special

Exception Permits," and may be issued for the purposes of scientific research, stock

enhancement, photography, or public display. *See id.* § 1374(c); 50 C.F.R. pt. 216(D). Prior to

issuing any Special Exception Permit, NMFS "must be assured" that the taking of the marine

mammal "is in accord with sound principles of resource protection and conservation as provided in the purposes and policies of [the MMPA]." *Id.* § 1371(a)(3). The MMPA requires NMFS to determine the appropriate provisions for Special Exception Permits and such permits "shall specify any . . . terms or conditions which [NMFS] deems appropriate." 16 U.S.C. § 1374 (b)(2)(D).

58.     Under the MMPA, NMFS and the MMC have the joint responsibility to review permit applications to take and import live marine mammals, and ensure that the applicant can properly care for and handle the animal. *See id.* §§ 1371(a)(1), 1373(a). NMFS promulgated regulations that required applicants for Special Exception Permits to provide detailed statements on their ability to "provide for the well-being of the animal."  Regulations Governing the Taking and Importing of Marine Mammals, 39 Fed. Reg. 1851, 1856 (Jan. 15, 1974). To that end, NMFS included in its Special Exception Permits general conditions related to capture, care, transportation, and disposition that applied both during and after capture or importation. Where advisable, NMFS also included specific conditions regarding the methods of care and transportation in individual permits that addressed particular concerns in extraordinary cases.

59.     One general condition routinely included in Special Exception Permits required that the permit holder submit necropsies, clinical histories, and other medical records to NMFS within thirty days of the death of the animal ("Necropsy Provisions").

60.     In 1994, Congress amended the MMPA to adopt certain changes applicable to the regulation of captive marine mammals. These amendments retained NMFS's jurisdiction over the take and importation of marine mammals held for purposes of public display, but generally transferred authority over the subsequent "care and maintenance of captive marine mammals" to the U.S. Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS")

under the Animal Welfare Act ("AWA"). *See* MMPA Amendments of 1994, Pub. L. No. 103-238, § 5, 108 Stat. 532, 537 (codified as amended at 16 U.S.C. § 1374). Under the amended statute, NMFS may issue Special Exception Permits for public display only to applicants and facilities that offer a program for education or conservation purposes that is based upon professionally recognized standards of the public display community, hold a license from APHIS under the AWA, and maintain facilities that are open to the public on a regularly scheduled basis. 16 U.S.C. § 1374(c)(2)(A). If NMFS determines at any point that the applicant or facility holding the marine mammal that is subject to a Special Exception Permit no longer meets those requirements, it may revoke the permit and seize the animal. *See id.* § 1374(c)(2)(D). Additionally, in the event that the marine mammal held subject to a Special Exception Permit is sold, purchased, transferred, or exported to another facility, NMFS must be notified at least fifteen days before the action. *See id.* § 1374(c)(2)(E). The MMPA requires NMFS to use this information, along with information gathered from original permit applications, to compile and maintain a Marine Mammal Inventory Report, which serves as an inventory of all marine mammals held pursuant to Special Exception permits and their progeny that includes identifying information for individual marine mammals—i.e., name, estimated or actual birth date, date and method of acquisition (e.g., import, captive birth, stranding, etc.), holding facility, transfer dates and receiving facilities if applicable, and date and cause of death. *See id.* § 1374(c)(10). Thus, although the 1994 amendments to the MMPA limited NMFS's jurisdiction over captive marine mammals, it did not eliminate NMFS's role, particularly where that role is consistent with the purposes of the MMPA.

61.     In addressing pre-1994 Special Exception Permits, Congress provided that preexisting permits were "modified to be consistent with that section [concerning the

qualifications public display under 16 U.S.C. § 1374(c)(2)(A)] as amended by this Act." MMPA Amendments of 1994, *supra*, at § 5(c); 16 U.S.C.A. § 1374 (note) (West 2010). Congress did not extinguish the pre-1994 permit provisions requiring the provision of necropsy and related information. Nor did it strip NMFS of its jurisdiction to effectuate the permit conditions it had imposed prior to 1994.

62. The requirement to provide necropsy and clinical history data to NMFS upon the death of the animal held subject to a permit is not inconsistent with APHIS's jurisdiction over the "care and maintenance" of captive cetaceans. The information subject to that requirement is also relevant to the "protection and conservation" of marine mammals that "move in interstate commerce," 16 U.S.C. § 1361(5), and to the conservation and recovery of marine mammals in the wild, over which APHIS has no authority, *see id.* § 1361(1)-(3). Therefore, the necropsy and clinical history reports fall squarely within the scope of the MMPA, as defined by the Congress.

63. Between 1994 and 2017, NMFS never articulated to the public any position as to the meaning of Section 5(c) of the 1994 Amendments whether the Necropsy Provisions of pre-1994 Special Exception Permits remained in force.

**B. <u>The Administrative Procedure Act</u>**

64. Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

65. An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

66.     When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Id.* at 43. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

## II.     FACTUAL BACKGROUND

### A.     Pre-1994 Special Exception Permits for Public Display

67.     After the MMPA was enacted, Special Exception Permits for the take and import of cetaceans for public display routinely included detailed standards for the care and maintenance of the subject animals and for collecting information relevant to the health and welfare of marine mammals, whether in captivity or the wild.

68.     Special Exception Permits included similar general conditions providing for various aspects of the subject animal's capture, transport, care, and disposition. Particularly relevant to this case, one such general condition—the Necropsy Provisions—required that the permit holder submit necropsies, clinical histories, and other medical records to NMFS within thirty days of the death of the animal. Permits also required that "[i]n the event of the death of any marine mammal or of the species of marine mammal authorized to be taken or imported, the holder shall make every reasonable attempt to notify the scientific community of the availability of specimen materials." *See, e.g.*, NMFS, Pub. Display Permit No. 774 (Oct. 7, 1992) (Tilikum's Special Exception Permit); NMFS, Pub. Display Permit No. 240 (June 30, 1978) (Kasatka's Special Exception Permit). These provisions were designed to provide the agency charged with

protecting and conserving marine mammals with medical information and research critical to safeguarding the health and well-being of cetaceans both in captivity and in the wild.

69. In 1979, APHIS promulgated Marine Mammal Standards to govern the care of captive marine mammals, *see* 44 Fed. Reg. 36,868 (June 22, 1979), pursuant to its authority under the AWA, which regulates the care and treatment of animals used for exhibition purposes, *see* 7 U.S.C. § 2131. Given these regulations, NMFS determined that the inclusion of certain detailed care and maintenance instructions in the Special Exception Permit requirements was no longer necessary. Therefore, NMFS published a "notice of amendment of conditions" providing that "[b]ecause of the implementation of the [APHIS rules], which cover these same activities, the similar conditions imposed by existing permits are considered to be superseded and are hereby replaced by the [AWA] standards." 44 Fed. Reg. 42,204, 42,205 (July 19, 1979). Although NMFS expressly rescinded permit conditions related to the care and maintenance of captive marine mammals, it did not rescind the Necropsy Provisions.

70. The Necropsy Provisions were routinely included as a general condition in Special Exception Permits issued between 1979 and 1994. The agency issued hundreds of permits with these provisions during that period. Based on data from NMFS's Marine Mammal Inventory Report, at least thirty Special Exception Permits were issued during this time period to allow the taking or import of individual orcas. Many more permits were issued to allow the taking or import of other cetaceans, including bottlenose dolphins and beluga whales.

71. Prior to 1994, public display facilities routinely submitted necropsy and medical data to NMFS upon the death of the animal, as required under the terms of their permits. This information was then made available to the public and the scientific community through FOIA. On information and belief, some public display facilities continued to submit necropsy and

clinical history reports to NMFS under the terms of pre-1994 Special Exception Permits after the

implementation of the 1994 MMPA amendments, yet NMFS never informed any public display

facility of its opinion that those Necropsy Provisions were no longer in effect until March 2017.

*See AWI v. NOAA*, No. 18-cv-00047 (D.D.C. Oct. 15, 2018), ECF No. 30(1).

### B.    The Importance of Necropsy and Medical Information to the Congressional Purposes Underlying the MMPA

72.    The MMPA places a high priority on research, declaring that "there is inadequate

knowledge of the ecology and population dynamics" of marine mammals. 16 U.S.C. § 1361(3).

In enacting the MMPA, Congress thus recognized that "hard evidence" on marine mammals was

lacking; and it was "[i]n the teeth of this lack of knowledge" that the MMPA required that "no

steps . . . be taken . . . that might prove to be adverse or even irreversible in their effects until

more is known." Marine Mammals: Hearings Before the Subcomm. on Fisheries & Wildlife

Conservation of the H. Comm. on Merch. Marine & Fisheries, 92d Cong. 1-2 (Sept. 9, 1971)

(statement of Rep. Dingell); H.R. Rep. No. 92-707, at 4148 (1971). To fulfill this congressional

intent, the MMPA includes multiple provisions focusing on marine mammal science, including

marine mammal health, *see* 16 U.S.C. §§ 1361(4), 1362(2), 1380(a), and courts have recognized

the vital role of "critical . . . scientific information" to the proper functioning of the MMPA,

*Comm. for Humane Legislation, Inc. v. Richardson*, 414 F. Supp. 297, 307 n.24, 310-11 (D.D.C.

1976), *aff'd*, 540 F.2d 1141, 1148 (D.C. Cir. 1976). Section 402(b) of the MMPA provides that

NMFS "shall . . . collect and update, periodically, existing information on," among other topics,

"appropriate scientific literature on marine mammal health, disease and rehabilitation"; "causes

of illnesses and deaths of stranded marine mammals"; and "other life history and reference level

data, including marine mammal tissue analyses" to "allow comparison of the causes of illness

and deaths in stranded marine mammals with physical, chemical, and biological environmental

parameters." 16 U.S.C. § 1421a(b). NMFS is required to make any such information that it collects available to "stranding network participants and other qualified scientists." *Id*. § 1421a(c).

73.     The data contained in the necropsy and clinical history reports of captive cetaceans are vital to developing a more complete understanding of cetacean biology and disease processes for animals in captivity and in the wild, which in turn, help achieve the conservation purposes of the MMPA. The records pertaining to captive cetacean health, behavior, and cause of death is important to assisting scientists, veterinarians, advocates, those in the public display industry, and members of the public to better understand the welfare of captive cetaceans. These records can also inform recommendations by scientists and advocates to improve standards of care for captive cetaceans. The reports serve as case studies, allowing scientists and veterinarians to elicit information about disease origin, its processes within the body, predisposing factors, behavioral impacts or consequences, and the success or failure of different treatments. The information gleaned from post-mortem pathology reports creates a database of medical, behavioral, and biological information that can be used to inform husbandry practices, alter captive facilities to improve health and welfare, and tailor medical interventions to improve and save the lives of captive animals.

74.     The content of necropsy and clinical history reports of captive cetaceans may also shed light on the health of wild cetaceans. Because deceased wild specimens are only rarely found in a suitable condition to be studied—if the bodies are found at all—access to the necropsy and medical records of captive cetaceans continues to be one of the few methods of developing case studies on individual cetaceans, which furthers the scientific community's understanding of the relationships between cetacean health and behavior. Additionally, the content of necropsy

and clinical history reports is useful to understanding—and potentially treating—disease in wild populations. Indeed, wild populations of cetaceans are increasingly exposed to chronic stress by exposure to noise and pollutants. Chronic stress can lead to immune-suppression, causing individuals to succumb to infection from environmental pathogens. Captive cetaceans also show signs of chronic stress, and sometimes succumb to diseases similar to those observed in the wild. Thus, the clinical history and pathology data for captive cetaceans may also help develop successful treatments and intervention strategies for wild cetaceans showing signs of illness. Moreover, the data obtained from captive cetaceans could help establish the base rates—i.e., the frequency of a certain disease in a given population—for various diseases in different cetacean species. Knowing how common or rare a certain disease is influences how veterinarians diagnose an animal, which in turn, helps veterinarians quickly identify which treatments are likely to be successful. Given the fact that many wild cetacean populations are teetering on the brink of extinction, scientists must rely on the entirety of available information—including information obtained from individuals in public display—to help wild cetaceans survive.

75.     SeaWorld itself has acknowledged the relevance of the clinical history data from captive cetaceans to the conservation of wild individuals. In the case of the orca Tilikum, SeaWorld claimed that the "suspected bacteria [causing Tilikum's death] is part of a group of bacteria that is found in water and soil both in wild habitats and zoological settings." His treatment regimen, which was moderately successful in that he survived for several months after his initial diagnosis, is highly relevant to the treatment and conservation of wild orcas. SeaWorld made similar statements in the case of Kyara, Tilikum's granddaughter, and in the case of Scarlet, an ailing member of the endangered Southern Resident Killer Whale population segment and the subject of an unprecedented coordinated rescue effort in late summer 2018. SeaWorld

consulted with NMFS on these efforts, and stated to the media that "a lot of the reasons they have been able to make some progress in this case, is because of SeaWorld's extensive medical history with the whales that are here in captivity [at SeaWorld] and then using that as a baseline to compare the killer whales in this population." However, whether SeaWorld has accurately established a baseline for Scarlet's—or any—disease remains unknown, as SeaWorld does not often publish its work in peer-reviewed journals or make necropsy and clinical history reports available to the public or experts not affiliated with SeaWorld. Thus, its process and treatments are anything but transparent. Moreover, devising treatment plans for disease in wild orca on an ad hoc, emergency basis is unhelpful and wastes precious time in identifying the diagnosis and treatment options. If the clinical history information on captive orcas was freely available to qualified scientists and veterinarians, then the baseline data for identifying, diagnosing, and treating many of these diseases—including perhaps the disease affecting Scarlet—could be established in the literature, and successful, peer-reviewed interventions readily identifiable, thus gaining precious time in treating the animal. As for Scarlet, ultimately, the efforts to save her were unsuccessful, and she disappeared. She is now presumed dead.

### C. Special Exception Permits for Tilikum and Kasatka

76.     Particularly relevant to this case are the pre-1994 Special Exception Permits issued to SeaWorld authorizing the import of orcas Kasatka and Tilikum.

77.     In 1978, NMFS issued a Special Exception Permit—Permit No. 240—to SeaWorld authorizing the take and import of four killer whales from North Atlantic waters. One of those orcas, Kasatka, was approximately two years old when she was captured off the coast of Iceland under the authority of Permit No. 240.

78.     Tilikum, who, with Kasatka, was featured in the well-known documentary, *Blackfish*, depicting the harmful effects of capturing and maintaining orcas in captivity, was captured in 1983 off the coast of Iceland. Tilikum was also approximately two years old when captured. He was imported to Canada, and held at the marine theme park Sealand of the Pacific in British Columbia with two other female orcas. In 1991, a trainer slipped and fell into the tank with the three animals. The orcas prevented the trainer from getting out of the pool, and repeatedly held her underwater until she eventually was drowned. Sealand promptly closed, and offered its orcas for sale. In 1991, SeaWorld applied for a Special Exception Permit to import the three killer whales. In 1992, NMFS entered an agreement with SeaWorld to authorize the import of Tilikum on an emergency basis to receive medical treatment and relief from his aggressive tank-mates. Later that year, NMFS issued Permit No. 774, pursuant to the Special Exception provisions of the MMPA, authorizing the import of Tilikum and the two female orcas for the purposes of public display.

79.     Both Permit No. 240 and Permit No. 774 included the standard general condition requiring SeaWorld to submit a necropsy and clinical history report "in a form consistent with accepted veterinary medical practices" within thirty days of the covered animal's death. The permits also contained the standard general conditions requiring that upon the death of "the species authorized to be imported," i.e., orcas, SeaWorld "make every reasonable attempt to notify the scientific community of the availability of specimen materials," and that SeaWorld permit NMFS "to inspect the holder's records and facilities insofar as such records and facilities pertain to activities authorized by this permit, relate to species covered by this permit, or pertain to [NMFS'] responsibilities under the Act."

80. Permit No. 774 applied its provisions—including the medical information reporting requirements—to the progeny of the three subject orcas. Tilikum was used extensively by SeaWorld for breeding purposes, and he fathered at least twenty-one calves, at least nine of which are alive and held in SeaWorld's facilities.

81. Both permits remained in effect after the 1994 MMPA amendments.

### D. Plaintiffs' Attempts to Obtain NMFS's Position on the Status of the Necropsy Provisions

82. Early in 2016, Plaintiffs Dr. Marino and Dr. Rally, scientists with expertise in marine mammal health and cognition, were preparing a scientific article on the effects of chronic stress on captive orcas. To aid in their research, they sought to obtain health records and necropsies for these animals from public display facilities. To that end, Dr. Rally attempted to work with NMFS to ascertain its position on the continued applicability of the Necropsy Provisions in pre-1994 Special Exception Permits, and to demonstrate to NMFS that the provisions survive the 1994 amendments. Their work took on a new urgency in March 2016, when SeaWorld announced that Tilikum was ill and would likely not recover. Recognizing the importance of the information likely contained in Tilikum's necropsy and clinical history reports, as well as the same reports for his many offspring, Plaintiffs PETA and AWI joined Drs. Marino and Rally in their efforts and began an extensive outreach program with the three agencies responsible for implementing the MMPA: NMFS, FWS, and the MMC.

83. Between August 2016 and January 2017, Plaintiffs PETA and AWI participated in several calls, and also exchanged emails with representatives from NMFS, FWS, and the MMC and their respective counsel regarding the Necropsy Provisions. Plaintiffs Dr. Rally and Dr. Rose also participated in several of those calls. PETA and AWI also submitted three drafts of the Necropsy Provision Issue Paper to the three agencies for review and comment prior to

NMFS's March 10, 2017 decision at issue in this case. Between October 2016 and April 2017, Plaintiffs Dr. Rally and Dr. Rose also participated in several meetings with representatives from NMFS, FWS, and the MMC to discuss the Necropsy Provision Issue Paper and other issues regarding necropsy reports in an attempt to obtain the agencies' positions regarding the continuing applicability of the Necropsy Provisions of pre-1994 Special Exception Permits. On the part of AWI and PETA, the goal of those conversations was to elicit the agencies' position on the continued applicability of the Necropsy Provisions. Indeed, the organizations sought a dialogue on the legal issue of the continued applicability of the Necropsy Provisions, as well as on the importance of the information for the health and welfare of cetaceans in captivity and the wild. The organizations' principal goal was to develop a consensus position that would serve as the basis for the release of this information by SeaWorld and other public display facilities to NMFS, which could then release the information to the scientific community and the general public pursuant to public records requests. Agency representatives were active participants in the conversations. At no point during any of these exchanges did agency representatives state that the pertinent issue—i.e., whether the Necropsy Provisions of pre-1994 Special Exception Permits remained in effect—had previously been decided. Nor did agency representatives offer their conclusion—either in person or in writing—one way or the other. To the contrary, on information and belief, NMFS engaged in an internal evaluation of the question of the continuing applicability of the Necropsy Provisions, exchanging multiple internal emails with officials and agency counsel, and holding a series of internal and interagency meetings with FWS and the MMC on the issue.

84. On January 6, 2017, Tilikum died, triggering SeaWorld's obligation under the Necropsy Provision of Permit No. 774 to submit his clinical history and necropsy reports to

NMFS within thirty days. To that end, on January 9, 2017, Plaintiff PETA sent a letter to NMFS discussing the importance of the necropsies and clinical histories of the animals covered by Permit No. 774, explaining that the permit provisions remain in effect following the 1994 MMPA amendments, and requesting that NMFS take steps to ensure SeaWorld's compliance with the terms of the permit. Likewise, on January 10, 2017, Plaintiff Dr. Rose sent a letter to NMFS on behalf of Plaintiff Organizations, in which she pointed out Permit No. 774's necropsy requirements, discussed the importance of enforcing the permit, and sought a status report and a meeting to discuss enforcement of the permit.

85.     On February 14, 2017, Dr. Rose again wrote to NMFS on behalf of Plaintiff Organizations to ask NMFS to require SeaWorld's compliance with the Necropsy Provision of Permit No. 774. In response, on March 10, 2017, NMFS announced its decision that "the necropsy provisions of the 1992 permit were effectively extinguished by the 1994 amendments to the MMPA and that jurisdiction of necropsies and associated reports is the province of APHIS under the AWA and its regulations." On information and belief, this March 2017 decision represents the first time that NMFS publicly declared a position on the continuing validity of the Necropsy Provisions. Nonetheless, NMFS asserted that the memorandum setting forth the agency's legal analysis supporting this position was exempt from disclosure under attorney client privilege, and continues to refuse to explain its conclusion.

86.     As a result of its legal decision that it lacked authority to do so, NMFS did not obtain Tilikum's necropsy, clinical history, and other medical records pursuant to the permit's Necropsy Provisions. NMFS's refusal to explain its position as set forth in an agency memorandum is the subject of ongoing FOIA litigation related to this complaint. *See* ¶ 1, *supra*.

87. On March 28, 2017, the MMC wrote to NMFS regarding the issue of whether the Necropsy Provisions of Tilikum's permit remained in effect. The MMC clearly confirmed the importance of necropsy and clinical history reports to captive and wild cetaceans, noting four reasons to support the importance of the documents to furthering the conservation goals of the MMPA, including because: (1) the information on organisms cultured from captive animals with known clinical signs and history can help interpret the significance of organisms cultured from wild animals of the same species; (2) understanding the types of lesions observed in post-mortems for captive animals helps interpret results from wild animals and guides investigations into current conservation issues; (3) samples collected at necropsy for containment analyses, combined with reproductive history, could help determine the role of contaminants in reproductive failure; and (4) medical histories could help regulatory agencies structure permits to select for those wild-caught animals most likely to adjust to captivity.

88. On July 24, 2017, one of Tilikum's progeny—his granddaughter, Kyara—died, followed shortly thereafter by Kasatka on August 15, 2017. Under the Necropsy Provisions of Permit No. 774—which extend to Tilikum's progeny—SeaWorld was obligated to submit Kyara's necropsy and medical data to NMFS within thirty days of her death. Kasatka's permit, Permit No. 240, required the same. After each death, Plaintiff Organizations wrote to NMFS regarding the continuing viability of the Necropsy Provisions of the applicable permits, and providing NMFS with revised copies of the Necropsy Provision Issue Paper. In response, NMFS merely restated its unexplained and unsupported decision that the 1994 MMPA amendments "effectively extinguished" the Necropsy Provisions in pre-1994 Special Exception Permits.

**E. The 2018 FOIA Litigation and NMFS's Subsequent Application of Its New Decision**

89. On September 29, 2017, Plaintiff AWI filed a FOIA request for records regarding NMFS's decision that the Necropsy Provisions of pre-1994 Special Exception Permits were extinguished by the 1994 MMPA amendments. NMFS repeatedly failed to acknowledge receipt of AWI's FOIA request. As a result, on January 9, 2018, AWI filed a lawsuit under FOIA.

90. Although NMFS released documents that it claimed to be responsive to AWI's request on February 20, 2018, it fully redacted all versions of the memorandum (and related correspondence) in which it set forth the reasoning underlying its newly minted policy regarding the Necropsy Provisions.

91. To date, NMFS has not explained how the Necropsy Provisions of pre-1994 Special Exception Permits are inconsistent with the 1994 MMPA amendments. Nor has it explained how its decision is consistent with the marine mammal protection, conservation and scientific research purposes of the MMPA.

92. In continued interactions with Plaintiffs, NMFS relied on its legal decision regarding the effect of the 1994 MMPA amendments on the general permit conditions in pre-1994 Special Exception Permits to deny Plaintiffs' repeated requests that NMFS exercise its authority under the permits to obtain necropsy and clinical history data. On three separate occasions in addition to the deaths of the three SeaWorld orcas, Plaintiffs wrote to NMFS reiterating the importance of necropsy and clinical history data to the conservation of wild cetaceans and to ensuring the welfare of those in captivity. First, on March 13, 2018, eight marine mammal experts, including Plaintiffs Dr. Cornick, Dr. Marino and Dr. Rally, submitted a request to NMFS that also cited Section 402(b) of the MMPA, 16 U.S.C. § 1421a(b)—which requires NMFS to collect and disseminate certain data on marine mammal health to qualified

researchers and experts—seeking necropsy and clinical history reports to aid in the experts' efforts to rescue, rehabilitate, and release stranded marine mammals. Second, on April 19, 2018, Plaintiff Organizations requested that NMFS exercise its authority under the related facility and records inspection provisions of Permit No. 240 in response to a serious injury sustained by Katina, one of the orcas in SeaWorld's care. Finally, on August 27, 2018, Plaintiff Organizations again requested that NMFS exercise its authority under the Necropsy Provisions to "gather important and potentially vital health information about orcas from SeaWorld that could be relevant" to the health and survival of the sickened wild orca Scarlet, a member of the endangered Southern Resident Killer Whale distinct population segment. In denying each of these requests, NMFS relied in whole or in part on its March 10, 2017 decision that the 1994 MMPA amendments extinguished certain general conditions—including the Necropsy Provisions—of pre-1994 permits. As before, NMFS failed to provide any reasoning or explanation for the decision. Its failure to do so has left plaintiffs with no recourse other than to initiate this lawsuit.

## PLAINTIFFS' CLAIMS FOR RELIEF

### Claim I: Violations of the Administrative Procedure Act

93. NMFS's March 10, 2017 final decision that NMFS lacks any legal authority to enforce the necropsy and related provisions of the pre-1994 permits represents final agency action that is reviewable under the APA including because it represented the consummation of NMFS's decisionmaking process and purports to determine the legal validity of pre-1994 Special Exception Permit provisions. The decision lacks any supporting explanation and is otherwise arbitrary, capricious, an abuse of discretion and not in accordance with law in violation of the APA.

94. NMFS's ongoing policy, pattern, and practice, beginning on March 10, 2017 and continuing after that time, of declaring that it lacks any legal authority to implement the Necropsy Provisions of the pre-1994 permits, *see, e.g.*, ¶¶ 82-92, is devoid of any supporting explanation, and is otherwise arbitrary, capricious, an abuse of discretion and not otherwise in accordance with law in violation of the APA.

95. NMFS's actions have injured Plaintiffs in the manner described in ¶¶ 4-49.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an Order:

1. Declaring that Defendants have violated the APA, vacating the March 10, 2017 decision and the policy, pattern, and practice invoking and applying that decision, and remanding for further consideration;

2. Awarding Plaintiffs their attorneys' fees and costs in this action; and

3. Awarding Plaintiffs such further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Elizabeth Lewis*
Elizabeth L. Lewis
D.C. Bar No. 229702
Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Avenue NW
Suite 210
Washington, DC 20016
(202) 588-5206
(202) 588-5049 (fax)
llewis@meyerglitz.com

*/s/ Eric R. Glitzenstein*
Eric R. Glitzenstein
D.C. Bar No. 358287
Meyer Glitzenstein & Eubanks LLP
4115 Wisconsin Avenue NW
Suite 210
Washington, DC 20016

(202) 588-5206
(202) 588-5049 (fax)
eglitzenstein@meyerglitz.com

*/s/ Donald Baur*
Donald Baur
D.C. Bar No. 393621
PERKINS COIE LLP
700 Thirteenth St. NW
Suite 600
Washington, DC 20005
(202) 654-6234
(202) 654-9105 (fax)
Dbaur@perkinscoie.com

*/s/ Bradley Oliphant*
Bradley H. Oliphant
D.C. Bar No. CO0075
PERKINS COIE LLP
1900 Sixteenth Street
Suite 1400
Denver CO  80202-5255
(303) 291-2352
(303) 291-2400 (fax)
BOliphant@perkinscoie.com