# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LORI MARINO, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, *et al.*, <br><br> *Defendants*. | No. 18-cv-2750 (DLF) |

## **MEMORANDUM OPINION**

The plaintiffs in this case are four individual scientists—Lori Marino, Heather Rally, Leslie Cornick, and Naomi Rose—and five animal protection organizations—People for the Ethical Treatment of Animals, Inc. ("PETA"), Animal Welfare Institute ("AWI"), Earth Island Institute ("EII"), Whale and Dolphin Conservation ("WDC"), and Cetacean Society International ("CSI"). They allege that the defendants—the National Marine Fisheries Service ("NMFS"), its parent agency, the National Oceanic and Atmospheric Administration ("NOAA"), and NOAA officials Tim Galludet, Chris Oliver, and Donna Wieting—acted arbitrarily and capriciously, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (the "APA"), when they interpreted the 1994 amendments to the Marine Mammal Protection Act, 16 U.S.C. §§ 1361-1423h (the "MMPA"), to foreclose NMFS's authority to enforce certain conditions in permits issued under the MMPA prior to 1994. Before the Court is the defendants' Motion to Dismiss for lack of standing and failure to state a claim. Dkt. 13 (Mot. to Dismiss). Because the plaintiffs lack standing to bring this action, the Court will grant the defendants' motion.

I.  BACKGROUND

   A.  Facts[1]

The MMPA states that one of its principal aims is to ensure that "certain species and population stocks of marine mammals" should "not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem." 16 U.S.C. § 1361(1), (2). One key MMPA provision aimed at attaining that goal is a "moratorium on the taking and importation of marine mammals and marine mammal products." *Id.* § 1371(a). That moratorium contains certain exceptions, and the MMPA allows NOAA to issue permits to take or import marine mammals pursuant to these exceptions. *Id.* § 1374.

Such permits are called "Special Exception Permits," and may be issued by NMFS for the purposes of scientific research, public display, or enhancing the survival or recovery of a species. *See id.* § 1374(c); 50 C.F.R. pt. 216(D). Prior to issuing any "Special Exception Permit," NMFS "must be assured that the taking of [the] marine mammal is in accord with sound principles of resource protection and conservation as provided in the purposes and policies of [the MMPA]." *Id.* § 1371(a)(3)(A). The MMPA requires NMFS to determine the appropriate provisions for Special Exception Permits; the permits must "specify . . . any . . . terms or conditions which [NMFS] deems appropriate." *Id.* § 1374(b)(2)(D).

According to the complaint, one condition "routinely included" in these permits requires the permittee to "submit necropsies, clinical histories, and other medical records to NMFS" within thirty days of the marine mammal's death (the "Necropsy Provisions"). Dkt. 1 (Compl.)

---

[1] The factual allegations below are drawn from the plaintiffs' complaint. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (court considering motion to dismiss must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor").

¶ 59. NMFS regularly included these Necropsy Provisions in Special Exception Permits it issued between 1979 and 1994, *id.* ¶ 70, and prior to 1994, "public display facilities routinely submitted necropsy and medical data to NMFS upon the death of the animal, as required under the terms of their permits," *id.* ¶ 71. The information was "then made available to the public and the scientific community through FOIA." *Id.*

Congress amended the MMPA in 1994. Pursuant to those amendments, NMFS retained jurisdiction over the taking and importation of marine mammals held for purposes of public display but transferred authority over the subsequent "care and maintenance of captive marine mammals" to the U.S. Department of Agriculture's Animal and Plant Health Inspection Service ("APHIS"). *See* MMPA Amendments of 1994, Pub. L. No. 103-238, § 5, 108 Stat. 532, 537 (the "1994 Amendments"). Congress further provided that Special Exception Permits issued prior to 1994 were "modified to be consistent with" the 1994 Amendments. *Id.* § 5(c). According to the plaintiffs' complaint, between 1994 and 2017, "NMFS never articulated to the public any position" as to "whether the Necropsy Provisions of pre-1994 Special Exception Permits remained in force" following the 1994 Amendments. Compl. ¶ 63.

On January 6, 2017, an orca named Tilikum died. *Id.* ¶ 84. Tilikum, the subject of the documentary *Blackfish*, was imported to the United States in 1992 pursuant to NMFS Permit No. 774. *Id.* ¶ 78. Tilikum's death triggered SeaWorld's obligation under Permit No. 774 to submit his clinical history and necropsy reports to NMFS within thirty days. *Id.* ¶ 84. Following Tilikum's death, two of the plaintiffs in this litigation (Naomi Rose and PETA) contacted NMFS to discuss NMFS's enforcement of the Necropsy Provisions contained in Tilikum's permit. *Id.* On February 14, 2017, more than thirty days after Tilikum's death, Rose wrote to NMFS requesting that NMFS enforce the conditions of Permit No. 774 against SeaWorld. *Id.* ¶ 85.

In a March 10, 2017 email response to Rose's request, NMFS asserted that "the necropsy provisions of the 1992 permit were effectively extinguished by the 1994 amendments to the MMPA and that jurisdiction of necropsies and associated reports is the province of APHIS under the [Animal Welfare Act ("AWA")] and its regulations." *Id.* ¶ 85. According to the complaint, "[a]s a result of its legal decision that it lacked authority to do so, NMFS did not obtain Tilikum's necropsy, clinical history, and other medical records pursuant to the permit's Necropsy Provisions." *Id.* ¶ 86. Based on subsequent interactions between the plaintiffs and NMFS, the complaint further alleges that "NMFS relied on its legal decision regarding the effect of the 1994 MMPA amendments on the general permit conditions in pre-1994 Special Exception Permits to deny [p]laintiffs' repeated requests that NMS exercise its authority under [pre-1994 permits] to obtain necropsy and clinical history data." *Id.* ¶ 92.

AWI, one of the plaintiffs in this case, subsequently sought to obtain information about NMFS's decision-making process by submitting a FOIA request to NOAA. *See Animal Welfare Inst. v. Nat. Oceanic and Atmospheric Admin.*, 370 F. Supp. 3d 116 (D.D.C. Feb. 28, 2019). That request, and the subsequent lawsuit brought by AWI, sought disclosure of "all documents from January 1, 2017 to May 1, 2017 regarding NMFS's determination that the necropsy requirements of Public Display Permit 774, which authorized the import of the orca whale known as 'Tilikum,' were extinguished by the 1994 amendments to the MMPA." *Id.* at 122. In particular, AWI sought disclosure of a draft memorandum allegedly containing the legal analysis underlying NMFS's decision. *Id.* at 124. The district court denied AWI's motion for summary judgment, reasoning that the draft memorandum was rightfully withheld under FOIA Exemption 5 pursuant to the attorney-client and work-product privileges. *Id.* at 139.

## B. Procedural History

The plaintiffs filed this lawsuit on November 27, 2018. Their complaint alleges that "NMFS's March 10, 2017 final decision that NMFS lacks any legal authority to enforce the necropsy and related provisions of the pre-1994 permits represents final agency action that is reviewable under the APA." *Id.* ¶ 93. The complaint further alleges that NMFS's decision "lacks any supporting explanation and is otherwise arbitrary, capricious, an abuse of discretion and not in accordance with law in violation of the APA." *Id.*

The defendants filed their motion to dismiss on March 22, 2019, arguing that the plaintiffs lack standing and that the complaint fails to state a claim. Mot. to Dismiss.

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

Under Rule 12(b)(1), a party may move to dismiss a claim over which the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "When ruling on a Rule 12(b)(1) motion, the court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (quotation marks and citation omitted). Because Rule 12(b)(1) concerns a court's ability to hear a particular claim, "the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). If the court determines that it lacks jurisdiction, the court must dismiss the claim or action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

## III. ANALYSIS

### A. Standing

Article III of the Constitution limits the "judicial Power" of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "[T]here is no justiciable case or controversy unless the plaintiff has standing." *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017). As the Supreme Court has interpreted this requirement, "the irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted). "The burden of establishing these elements falls on the party invoking federal jurisdiction, and at the pleading stage, a plaintiff must allege facts demonstrating each element." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).

The plaintiffs claim injury in fact on the ground that NMFS's decision has deprived them of information that they would otherwise have received in the absence of that decision: namely, the necropsy reports that marine parks and zoos were required to submit to NMFS pursuant to the terms of pre-1994 MMPA permits. According to the complaint, "[a]s a result of NMFS's . . . interpretation of the law, plaintiffs are unable to obtain the medical and scientific information vital to their professional and organizational pursuits, information that would otherwise be routinely available to them through, e.g., the [FOIA]." Compl. ¶ 1. The complaint further alleges that "NMFS's unexplained and legally unsupported decision deprives the scientific community of necropsy and clinical history information concerning captive cetaceans held

6

pursuant to federal permits issued under the MMPA." *Id.* ¶ 13. That allegation recurs almost verbatim throughout the complaint, *see id.* ¶¶ 19, 25, 31, 36, 40, 44, 48.

Where a plaintiff's claimed injury in fact is based on the deprivation of information to which it believes itself to be lawfully entitled, a plaintiff must "allege[] that: '(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Jewell*, 828 F.3d at 992 (citing *FEC v. Akins*, 524 U.S. 11, 21–22 (1998)); *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95, 103 (D.C. Cir. 2019) ("*EPIC*"). "[T]he existence and scope of an injury for informational standing purposes is defined by Congress: a plaintiff seeking to demonstrate that is has informational standing generally 'need not allege any *additional* harm beyond the one Congress has identified.'" *Jewell*, 828 F.3d at 992 (quoting *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016) (emphasis in original)). But the plaintiff must point to some statutory entitlement to the information it seeks, because otherwise it has not identified the "legally protected interest" that injury in fact requires. *Lujan*, 504 U.S. at 560.

The D.C. Circuit has faithfully applied this two-pronged informational standing test in other contexts where the plaintiff's claim to standing was based on a denial of access to information. For instance, in *Jewell*, the plaintiff's lawsuit sought to compel the Secretary of the Interior to comply with a 12-month deadline contained in section 4 of the Endangered Species Act, 16 U.S.C. § 1351 *et seq.* (the "ESA"). 828 F.3d at 990. Once the Secretary issued its findings pursuant to that deadline, the plaintiff reasoned, the Secretary would then be required to comply with the attendant disclosure requirements, which would afford the plaintiff access to the information he sought. *Id.* at 992. The D.C. Circuit concluded that the plaintiff's theory of

standing "fail[ed] at the first part of the inquiry," however, because the plaintiff sought "to enforce a statutory deadline provision that by its terms does not require the public disclosure of information." *Id.* Section 4 mandated the disclosure of information at "a later time in the listing process," only *after* the Secretary issued its 12-month findings. *Id.* Similarly, in *American Society for the Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 659 F.3d 13 (D.C. Cir. 2011), the court applied the informational standing test to another ESA plaintiff who contended that the defendant's treatment of elephants constituted a "take" under section 9 of the ESA. *Id.* at 17. The plaintiff reasoned that if its section 9 claim succeeded, the defendant would be forced to pursue a permit for its activities under section 10, affording the plaintiff access to information that it could then use to pursue its organizational goals. *Id.* at 22. As in *Jewell*, the court rejected the plaintiff's standing argument, reasoning that even if the plaintiff's claim succeeded on the merits, the defendant "would be obligated to cease those practices, but nothing in section 9, even under [the plaintiff's] view, would entitle [the plaintiff] to any information." *Id.* at 23. In other words, in both cases, the court concluded that the plaintiff lacked standing because it could not meet the first prong of the informational injury test.

Applying the informational injury test to this case, the Court need only consider the first prong of the test to conclude that the plaintiffs' allegations fall short. None of the plaintiffs have alleged that they have "been deprived of information" that, even on their interpretation of the law, "a statute requires the government or a third party to disclose" to them. *EPIC*, 928 F.3d at 103. Nor could they. Indeed, nothing in the MMPA—or any other statute—requires NMFS to collect necropsy reports from the marine parks and zoos it regulates. To the contrary, as the plaintiffs' own complaint acknowledges, the MMPA "*authorize[s]* NOAA to issue permits to take or import marine mammals," Compl. ¶ 56 (emphasis added); the MMPA directs that permits

issued by NMFS "specify any . . . terms or conditions which [NMFS] *deems appropriate*," *id.*
¶ 57 (quoting 16 U.S.C. § 1374(b)(2)(D) (emphasis added)); and the permits that NMFS
ultimately issued merely "*routinely . . . required* that the permit holder submit necropsies,
clinical histories, and other medical records to NMFS," *id.* ¶ 59 (emphasis added). The
unenforced Necropsy Provisions that the plaintiffs identify as the source of their alleged injuries
are not creatures of statute, but instead consequences of NMFS's discretionary decision to
include those provisions in the permits it issued, as well as its discretionary decision to issue
those permits in the first place. Accordingly, no statute "requires the government or a third party
to disclose" the information that the plaintiffs seek, *EPIC*, 928 F.3d at 103, and the plaintiffs
have therefore failed to allege a cognizable informational injury.

        The plaintiffs resist this conclusion by attempting to recast their injuries as ones that
might escape application of the informational injury standard. *See, e.g.*, Dkt. 14 (Opp'n to Mot.
to Dismiss) at 14 ("Plaintiffs are *not* alleging that they are injured through deprivation of a
statutory right to obtain information in the same manner as, e.g., persons who are deprived of
information that FOIA . . . require[s] to be made public." (emphasis in original)). But the
plaintiffs cannot escape the fact that every injury alleged in their complaint is fundamentally
derivative of their lack of access to the information they seek: namely, the necropsy reports. For
instance, the complaint alleges that NMFS's decision "harms Dr. Marino's ability to prepare [an]
article on the effects of chronic stress on captive orcas[] and inhibits her ability to draw accurate
conclusions from the incomplete data," Compl. ¶ 6, and that the decision "negatively affects [Dr.
Rose's] ability to participate in the scientific discourse regarding the impacts of captivity on
individual marine mammals," *id.* ¶ 25. But these harms, although cast as impediments to
Marino's and Rose's ability to pursue their research interests and career goals, are inextricably

linked to their inability to obtain the necropsy reports. Likewise, the complaint alleges that NMFS's decision "impairs PETA's ability to educate the public and policymakers regarding the conditions endured by cetaceans in captivity and to advocate against the expansion of the public display industry using science-based information . . . ." *Id.* ¶ 31. But once again, those harms are mere second-order consequences of PETA's inability to access the reports. The injuries alleged in the complaint are thus unavoidably informational in nature, and the plaintiffs cannot establish standing without meeting the requirements for informational injury. *See, e.g.*, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) ("*PACEI*"); *The Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, No. 19-CV-824, 2020 WL 42845, at *5 (D.D.C. Jan. 3, 2020).

The plaintiffs cite several D.C. Circuit precedents in support of their theory of standing, but none of those cases compel the result they seek. The individual plaintiffs, for their part, rely heavily on *American Friends Service Committee v. Webster*, 720 F.2d 29 (D.C. Cir. 1983), in which the court recognized standing for a group of professional historians, journalists, teachers, film writers, and attorneys who sued the FBI seeking to enjoin its records destruction program. *Id.* at 46. But *Webster* was decided in 1983, long before more recent Supreme Court cases set forth the modern requirements for informational standing, *see, e.g., Akins*, 524 U.S. 11, and the standing analysis in *Webster* focused mainly on the "zone of interests" test, which the Supreme Court has more recently relegated to a question of statutory interpretation, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). More importantly, the result in *Webster* is not inconsistent with the result the Court reaches here because the *Webster* plaintiffs had a statutory basis for the information they sought: statutory provisions arguably intended to ensure "the preservation of documents which may be of use to private citizens." *Webster*, 720

F.2d at 46 (quoting *Am. Friends Serv. Comm. v. Webster*, 485 F. Supp. 222, 227 (D.D.C. 1980)). The individual plaintiffs also rely on cases involving competitor standing, *see, e.g.*, *DirecTV, Inc. v. FCC*, 110 F.3d 816 (D.C. Cir. 1997), to argue that NMFS's decision puts the plaintiffs "at a competitive disadvantage as compared to scientists and veterinarians who work for marine parks and zoos," Compl. ¶ 7. Yet all of those cases involve businesses challenging agency regulations that had allegedly conferred some commercial advantage on their competitors, a scenario with minimal relevance to cetacean research and advocacy, especially given the complaint's specific allegation that the in-house researchers with allegedly superior access to the necropsy data "rarely publish in peer-reviewed journals" of the sort that the plaintiffs frequent, *id.*

The organizational plaintiffs, meanwhile, rely principally on *People for the Ethical Treatment of Animals, Inc. v. U.S. Department of Agriculture*, 797 F.3d 1087 (D.C. Cir. 2015) ("*PETA*"), and *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986), to support their claim to standing. But the allegations of injury in those cases went beyond the mere deprivation of information. In *PETA*, the plaintiff claimed that the USDA's failure to apply the AWA to birds had caused it injury because "it precluded PETA from preventing cruelty to and inhumane treatment of these animals through its normal process of submitting USDA complaints and it deprived PETA of key information that it relies on to educate the public." 797 F.3d at 1094 (internal quotation marks omitted). The court's opinion analyzed these two injuries together and found that the *combination* of the two injuries—"denial of access to bird-related AWA information including, in particular, investigatory information, *and a means by which to seek redress for bird abuse*," *id.* at 1095 (emphasis added)—sufficed to constitute injury in fact. Similarly, in *Action Alliance*, the injuries alleged went beyond the mere

11

deprivation of information, and the court analyzed the various injuries together as one.² As the court described the allegations, "the challenged regulations deny the [plaintiffs] access to information *and avenues of redress* they wish to use in their routine information-dispensing, counseling, and referral activities." 789 F.2d at 937–38 (emphasis added). Indeed, one of the regulations challenged in *Action Alliance* allegedly threatened to "raise the cost and difficulty of contesting a denial of services" to a degree that would "make administrative review a meaningless process and leave [the plaintiffs] with only one viable option: time-consuming and expensive resort to the courts." *Id.* at 937. The Circuit's use of a different doctrinal lens in these cases is unsurprising given that neither presented a pure question of informational injury.

In this case, by contrast, every allegation of injury in the complaint is a direct outgrowth of the plaintiffs' inability to access the necropsy reports required by the pre-1994 MMPA permits, which allegedly contain the scientific information that the plaintiffs need in order to pursue their career goals and organizational activities. Because all the injuries alleged stem from a denial of access to information to which the plaintiffs believe they are lawfully entitled, this Circuit's test for informational injury must apply. *See EPIC*, 928 F.3d at 103; *PACEI*, 878 F.3d at 378. As explained above, none of the plaintiffs can meet the requirements of this test. They have therefore failed to allege a cognizable injury in fact, and they therefore lack standing to pursue this lawsuit.³ Accordingly, the Court will grant the defendants' motion to dismiss.

---

² *Action Alliance*, like *Webster*, was also decided in the 1980s, well before the Supreme Court articulated the modern requirements for informational standing in cases like *Akins*.

³ Because the plaintiffs have failed to allege injury in fact and lack standing on that ground alone, the Court will not address the parties' arguments regarding causation and redressability. Likewise, because the Court will grant the defendants' motion to dismiss under Rule 12(b)(1), the Court will not address the defendants' arguments that the complaint should be dismissed under Rule 12(b)(6) for failure to state a claim.

## CONCLUSION

For the reasons stated above, the defendants' motion to dismiss the plaintiffs' complaint is granted. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date: March 26, 2020